George KOVIAN, Plaintiff,

v.

The FULTON COUNTY NATIONAL BANK AND TRUST COMPANY, Charles Moyses, John Valerius, Vincent Salluzzo, Robert Salluzzo, John Gleason, Gleason and Salluzzo, Adirondack Homesites, Inc., Capital Medical Leasing Corporation, Hoye & Hoye, and Theodore E. Hoye, Jr., Defendants.

No. 86–CV–154.

United States District Court, N.D. New York.

Nov. 10, 1986.

Wood, Holtzworth & Seward, Gloversville, N.Y., for defendant Fulton County Nat. Bank and Trust Co.; Jerry Wood, of counsel.

Fitzpatrick, Trombley, Owens & Lahtinen, Plattsburgh, N.Y., for defendants Gleason & Salluzzo, Robert Salluzzo and John Gleason; William L. Owens, of counsel.

Lombardi, Reinhard, Walsh & Harrison, Albany, N.Y., for defendants Vincent Salluzzo, Adirondack Homesites Inc. and Capital Medical Leasing Corp.; Richard P. Walsh, Jr., of counsel.

James C. Hayes III, Amsterdam, N.Y., for defendant John Valerius.

Lomanto & Jung, Gloversville, N.Y., for defendant Charles Moyses; Edward S. Lomanto, of counsel.

## MEMORANDUM–DECISION AND ORDER

MUNSON, Chief Judge.

Defendant's motion pursuant to F.R. Civ.P. 12(b)(6) to dismiss the amended complaint in the above-captioned action raises difficult questions concerning the extent to which the civil remedies provided by the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961–1968 (1982), are available in disputes arising out of complex business transactions. Plaintiff's inartfully pleaded amended complaint, organized into six "claims," essentially raises seventeen separate possible bases of liability under RICO, all arising out of a single business transaction which transferred plaintiff's stock in a corporation he formed some years earlier to one of the defendants. Because of uncertainty concerning the scope of civil RICO in the aftermath of the Supreme Court's opinion in *Sedima, S.P.R.L. v. Imrex Co., Inc.,* 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985), the court feels compelled to discuss defendant's motion at length in this opinion.

Oliver & Oliver, Albany, N.Y., for plaintiff; Lewis B. Oliver, of counsel.

Roche, Corrigan, McCoy & Bush, Albany, N.Y., for defendants Hoye & Hoye and Theodore E. Hoye, Jr.; Robert Roche, of counsel.

**832**

## I. BACKGROUND

Plaintiff alleges that he and defendant John Valerius formed Adirondack Homesites, Inc. ["Adirondack"] in 1977. The corporation was apparently formed to facilitate the completion of a construction project. Valerius was in charge of the corporation's financial matters, while plaintiff was in charge of the construction work on an apartment complex which came to be known as the Fonda Project. Plaintiff was the sole stockholder in Adirondack, purportedly at Valerius's request.

Valerius arranged permanent financing for the Fonda Project by obtaining a mortgage from the Farmers Home Administration ["FmHA"]. Adirondack obtained interim financing through construction loans from defendant Fulton County National Bank and Trust Company ["the Bank"]. Plaintiff was the guarantor of those loans. Defendant Charles Moyses was the Vice-President of the Bank who negotiated the loans.

In 1981 plaintiff and Valerius agreed to discontinue their business relationship and sell Adirondack, but were unable to locate a buyer until 1983. In 1983 a buyer was found, apparently through the plaintiff's accountants, defendant Gleason & Salluzzo, or through defendant Robert Salluzzo individually. The buyer was defendant Capital Medical Leasing Corporation ["Capital"], whose president was defendant Vincent Salluzzo. At the time of the sale, Adirondack's principal asset was the Fonda Project itself, which had an estimated value of $950,000 and an outstanding FmHA mortgage of about $850,000.

On April 19, 1983 the closing was held in the law offices of defendant Hoye & Hoye. Plaintiff and defendants Valerius, Moyses, Robert Salluzzo, Vincent Salluzzo, Theodore Hoye, and John Gleason were all present. Plaintiff signed four agreements. The first two agreements effectuated the sale of Adirondack's stock to Capital

(Amended Complaint Exs. A and B). In a third agreement Capital and Adirondack, through Vincent Salluzzo, now the president of both corporations, acknowledged a debt to plaintiff in the amount of $118,000. (Amended Complaint Ex. C). A fourth agreement obligated plaintiff to manage the Fonda Project for six years, with plaintiff guaranteeing up to $50,000 against any deficit occurring during this period. (Amended Complaint Ex. D). Cashier's checks in the amounts of $15,000 and $20,-000 were issued by the Bank to Gleason & Salluzzo and Robert Salluzzo, respectively, apparently as finder's fees. Plaintiff approved payment on both checks. (Amended Complaint Exs. E and F). A promissory note bearing plaintiff's signature and made out in the amount of $88,328.76 was also dated April 19, 1983, though plaintiff denies knowledge of how this note came into existence. (Amended Complaint Ex. G). By that note plaintiff assumed a prior obligation owed by Adirondack of $50,000 plus interest, and also assumed liability for the $35,000 that the Bank had paid out to Gleason & Salluzzo and Robert Salluzzo.

The defendants claim that plaintiff did not honor the agreement struck by the parties, failing to manage the Fonda Project without a deficit. Adirondack ceased payment to plaintiff, claiming that plaintiff's breach of the fourth agreement relieved it of its obligations under the third. Thereafter, the Bank brought an action in state court to recover on certain notes bearing plaintiff's signature. This state court action is still pending. Plaintiff then brought his RICO claims in this court.[1]

Plaintiff asserts that Valerius had assured him that his Adirondack stock would be sold to Capital for $118,000, with the purchase price going to pay debts the plaintiff had accrued by guaranteeing the Bank's loans to Adirondack. Plaintiff contends that on the day of the closing, however, he was "forced" into signing the four

---

1. The original complaint, filed with this court on February 7, 1986, was dismissed on May 27, 1986 and the plaintiff was instructed to file an amended complaint within thirty days. The amended complaint, a 59 page, 135-paragraph document, not counting appendices, was filed on June 26, 1986.

agreements and approving the cashier's checks given to Gleason & Salluzzo and Robert Salluzzo. Plaintiff claims that when he voiced his objection to the terms of the agreements on the day of the closing, defendant Moyses, in the presence of the other defendants, threatened to call in all of Adirondack's outstanding notes and to refuse to extend plaintiff credit in the future. At this point plaintiff admits he signed the four agreements and approved the two checks.

Plaintiff also denies knowledge of how certain promissory notes bearing his signature and held by the Bank came into existence. Plaintiff claims that when he originally went to the Bank for loans needed to finance the construction of the Fonda Project, Moyses, pursuant to Bank policy, required him to sign four blank promissory notes. Plaintiff claims that one of these notes was completed by the Bank and Moyses without his authorization at an unknown time and place in the amount of $88,328.76. That note is dated April 19, 1983. Plaintiff further alleges that he did not authorize the completion of three other notes bearing his signature. One such note, dated September 23, 1983, is in the amount of $46,691.97 and signed by plaintiff in his capacity as president of Adirondack. Plaintiff notes that as of that date he no longer held any corporate office with Adirondack. A second note, dated September 27, 1983, is made out for $98,800.35 and is signed by plaintiff in his individual capacity. A third, in the amount of $118,000 and dated October 3, 1983, was also signed by plaintiff in his individual capacity. Some of these notes were apparently used to cancel out the others, and after October 3, 1983 only this last note remains outstanding.

Finally, plaintiff complains that he never received any payments under the third agreement signed by Vincent Salluzzo as President of Capital and Adirondack. Instead, payments went directly to the Bank and were applied to reduce the unauthorized notes dated April 19, September 27 and October 3. Since August 20, 1984 Adirondack has refused to pay on the debt acknowledged by the third agreement.

Plaintiff's amended complaint sets out these allegations and is organized into six "claims" defining six distinguishable "enterprises" affecting interstate commerce.[2]

2. Plaintiff's first claim alleges that defendant Moyses was a person associated with an enterprise affecting interstate commerce, namely the Fulton County Bank, who was "conducting such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt" in violation of 18 U.S.C. § 1962(c) (1982). Plaintiff claims that the "pattern of racketeering activity" consisted of the following predicate acts: an extortionate credit transaction violative of 18 U.S.C. §§ 891–894 (1982); interference with commerce by extortion in violation of 18 U.S.C. § 1951 (1982); larceny by extortion (N.Y. Penal Law §§ 155.05(2)(e), 155.40 (McKinney 1975)); and mail fraud (18 U.S.C. § 1341 (1982)). Plaintiff also claims that Moyses conducted the Bank's affairs "through the collection of an unlawful debt" because the promissory note for $88,328.76 dated April 19, 1983 was usurious. Finally, plaintiff asserts that all of the named defendants conspired together to conduct the Bank's affairs through a "pattern of racketeering activity" or through the collection of an "unlawful debt" in violation of 18 U.S.C. § 1962(d) (1982).

Plaintiff's second claim states that all of the named defendants formed an "association in fact" that was an "enterprise" engaged in and affecting interstate commerce. The "association" was allegedly formed for the purpose of defrauding plaintiff in the sale of Adirondack, and this scheme was ongoing and continued after April 19, 1983. Each of the members of the "association" is accused of conducting its affairs through a "pattern of racketeering activity" consisting of the predicate acts listed in the first claim, as well as additional instances of mail fraud. Each member of the "association" is also accused of conducting the association through the collection of an "unlawful debt," namely the allegedly usurious promissory note dated April 19, 1983.

In plaintiff's third claim the "enterprise" is defined as Adirondack. Defendants Vincent Salluzzo and Capital are accused of conducting Adirondack through a "pattern of racketeering activity" consisting of the predicate acts listed in the second claim, and of operating the enterprise through the collection of an "unlawful debt," referring again to the note dated April 19, 1983. All of the defendants are accused of conspiring to conduct Adirondack in violation of § 1962.

In the fourth claim the "enterprise" involved is Capital. Vincent Salluzzo is accused of conducting its affairs through a "pattern of racketeering activity" or the collection of an "unlaw-

834

Within five of the six "claims" plaintiff identifies three distinct bases for liability under civil RICO: the conduct of an enterprise affecting interstate commerce through a "pattern of racketeering activity" in violation of 18 U.S.C. § 1962(c) (1982); the conduct of an enterprise through the collection of an "unlawful debt" in violation of § 1962(c); and conspiracy to violate the provisions of § 1962(c) in violation of § 1962(d). A sixth claim is predicated on § 1962(c) only. The defendant Bank has moved to dismiss the amended complaint pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted, and all other defendants named in this action have joined in this motion. For the disposition of this motion all of plaintiff's allegations are presumed to be true and the facts are construed in a light most favorable to plaintiff's cause of action. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974).

ful debt," and all of the defendants are accused of conspiring to do the same.

In the fifth claim defendants Robert Salluzzo and John Gleason are accused of operating an enterprise, namely the accounting firm Gleason & Salluzzo, through a "pattern of racketeering activity" or through the collection of an "unlawful debt." All of the defendants are accused of conspiring to violate § 1962(c) through the unlawful operation of the "enterprise."

In the sixth claim the defendant Bank is accused of operating an "enterprise," which is defined as the Bank itself, through a "pattern of racketeering activity" or through the collection of an "unlawful debt," and all of the named defendants are accused of conspiring to do the same. It should be noted that § 1962(c) prohibits "any person employed by or associated with any enterprise engaged in ... interstate commerce" from conducting the enterprise in the proscribed manner, and thus it appears impossible for the "person" and the "enterprise" to be the same entity under the statute. Nonetheless, it is unnecessary to address this issue given the disposition of the rest of plaintiff's claims in the text of this opinion.

3. The Act defines "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4) (1982).

4. 18 U.S.C. § 1962(c) provides:

## II. PLAINTIFF'S ALLEGATIONS OF A "PATTERN OF RACKETEERING ACTIVITY"

Among the remedies created by the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–1968 (1982), is a private cause of action for treble damages, costs and attorneys' fees for injuries to one's "business or property by reason of a violation" of § 1962. 18 U.S.C. § 1964(c)(1982). Among other things, § 1962 prohibits any person employed by or associated with an "enterprise"[3] from conducting its affairs through a "pattern of racketeering activity." 18 U.S.C. § 1962(c) (1982).[4] Section 1961(5) requires a showing of at least two "acts of racketeering activity" occurring within ten years of each other in order to establish a "pattern of racketeering activity."[5] "Racketeering activity" is defined by § 1961(1) to include a variety of state and federal offenses.[6] In the present case, the predicate acts alleged by plaintiff vary slightly in

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c) (1982).

5. The Act provides that "'pattern of racketeering activity' requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5) (1982).

6. The passages of section 1961(1) that are relevant to the present case identify the following offenses as "racketeering activity":

(A) any act or threat involving ... extortion ... which is chargeable under State law and punishable by imprisonment for more than one year; (B) any act which is indictable under any of the following provisions of title 18, United States Code: ... sections 891–894 (relating to extortionate credit transactions), ... section 1341 (relating to mail fraud), ... section 1957 (relating to interference with commerce, robbery or extortion)....

18 U.S.C. § 1961(1) (1982).

each of the six "claims" set forth. Of these, the only acts of racketeering that can be sustained[7] on the face of the pleadings are a number of alleged violations of the Federal Mail Fraud Statute, 18 U.S.C. § 1341 (1982).[8] At issue is whether these allegations of mail fraud, if true, demonstrate a "pattern of racketeering activity" sufficient to support a RICO action.

The Supreme Court has noted that "two isolated acts of racketeering activity do not constitute a pattern." *Sedima, S.P.R.L. v. Imrex Co., Inc.,* 473 U.S. 479, 105 S.Ct. 3275, 3285 n. 14, 87 L.Ed.2d 346 (1985). Unfortunately, there seems to be little agreement among the courts on what *does* constitute a "pattern." There are cases suggesting that a "pattern" can be established by "two acts occurring on the same day in the same place and forming part of the same criminal episode." *United States v. Moeller,* 402 F.Supp. 49, 58 (D.Conn. 1975); *see United States v. Parness,* 503 F.2d 430 (2d Cir.1974), *cert. denied,* 419 U.S. 1105, 95 S.Ct. 775, 42 L.Ed.2d 801 (1975). One court has recently held that two related acts of mail fraud in a single scheme dealing with a single transaction can constitute a "pattern of racketeering activity." *R.A.G.S. Couture, Inc. v. Hyatt,* 774 F.2d 1350 (5th Cir.1985); *see also Illinois Dept. of Revenue v. Phillips,* 771 F.2d 312 (7th Cir.1985) (mailing of nine fraudulent tax returns over nine month period constitutes "pattern of racketeering activity"); *Soper v. Simmons International, Ltd.,* 582 F.Supp. 987 (N.D.N.Y.1983) (Munson, C.J.) (separate incidents of mail and wire fraud in furtherance of single scheme to defraud plaintiffs sufficient to establish "pattern").

Other recent cases, however, have required a greater showing to establish a "pattern" sufficient to support a cause of action under RICO. These cases reason that

"pattern" ... connotes a multiplicity of events: Surely the continuity inherent in the term presumes repeated criminal ac-

7. A number of the predicate acts asserted by plaintiff are not supported by sufficient factual allegations in the amended complaint and are thus disregarded. In each of his six "claims," plaintiff alleges as predicate acts extortionate extension of credit in violation of 18 U.S.C. § 891–894 (1982); interference with commerce by extortion (18 U.S.C. § 1951 (1982)); and larceny by extortion in violation of N.Y.Penal Law §§ 155.05, 155.40 (McKinney 1975). Plaintiff's claims under each of these statutes is based on his contention that he was "forced" to sign four agreements and approve two cashier's checks on April 19, 1983 after Moyses, the Vice-President of the Bank, threatened to call in Adirondack's outstanding notes and to refuse to extend plaintiff credit in the future if he did not go along with the deal ultimately entered into on that day.

Plaintiff does not allege facts sufficient to sustain a claim under 18 U.S.C. §§ 891–894. "Extortionate extension of credit" is defined as an extension of credit in which both creditor and debtor understand that delay or failure to make repayment "could result in the use of violence or other criminal means to cause harm to the person, reputation, or property of any person." 18 U.S.C. § 891(6) (1982). "Extortion" ordinarily contemplates the threat of violent force, which is not present in the plaintiff's allegations; further, there is no indication that the Bank could not lawfully call in the outstanding promissory notes, and it certainly is within the discretion of a financial institution to refuse to extend credit to an individual, and so there is no evidence that any of the defendants used "other criminal means" to injure plaintiff within the meaning of the statute. Similarly, the Hobbs Act (18 U.S.C. § 1951) is not applicable here. Under the Act "extortion" is defined as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2) (1982).

The state crimes invoked by plaintiff, larceny by extortion and grand larceny in the first degree, N.Y. Penal Law §§ 155.05(2)(3), 155.40 (McKinney 1975), define "extortion" in terms similar to the federal statutes here discussed, and are similarly inapplicable to the facts of this case.

8. The Federal Mail Fraud Statute proscribes the use of the mails to execute "any scheme or artifice to defraud." 18 U.S.C. § 1341 (1982). In each of the plaintiff's six claims, plaintiff alleges that four promissory notes signed by plaintiff were completed by Moyses or the Bank without his authorization and mailed either to plaintiff or Adirondack. In addition, the second, third and fourth claims allege that Vincent Salluzzo and Capital committed mail fraud by making payments owed plaintiff directly to the Bank to be applied against the allegedly fraudulent promissory notes in furtherance of the scheme to defraud plaintiff.

*tivity,* not merely repeated *acts* to carry out the *same* criminal activity. It places a real strain on the language to speak of a single fraudulent effort, implemented by several fraudulent acts, as a "pattern of racketeering activity."

*Northern Trust/O'Hare, N.A. v. Inryco, Inc.,* 615 F.Supp. 828, 831 (N.D.Ill.1985) (emphasis in original) (several mailings in furtherance of an ongoing kickback scheme did not establish RICO "pattern"); *see also Superior Oil Co. v. Fulmer,* 785 F.2d 252 (8th Cir.1986); *Professional Assets Management, Inc. v. Penn Square Bank, N.A.,* 616 F.Supp. 1418 (W.D.Okla.1985) (preparation of audit report by accounting firm, although involving numerous constituent acts, was a single unified transaction and not a "pattern of racketeering activity"); *Allington v. Carpenter,* 619 F.Supp. 474, 478 (C.D.Cal.1985) ("[A] 'pattern' of racketeering activity must include racketeering acts sufficiently unconnected in time or substance to warrant consideration as separate criminal episodes"); *Morgan v. Bank of Waukegan,* 615 F.Supp. 836 (N.D. Ill.1985) (allegations of repeated acts to carry out same criminal activity do not constitute "pattern of racketeering activity"); *Teleprompter of Erie, Inc. v. City of Erie,* 537 F.Supp. 6 (W.D.Pa.1981) (numerous alleged bribes relating to single fund-raising event did not constitute a "pattern" but instead "constitute[d] one single act of unlawful activity").

The law in this Circuit is unsettled. In *United States v. Weisman,* 624 F.2d 1118 (2d Cir.), *cert. denied,* 449 U.S. 871, 101 S.Ct. 209, 66 L.Ed.2d 91 (1980), the Court of Appeals indicated that *any* two acts of racketeering by the same enterprise, no matter how unrelated, can establish a "pattern." *Id.* at 1121–23. In *United States v. Parness,* 503 F.2d 430 (2d Cir.1974), *cert. denied,* 419 U.S. 1105, 95 S.Ct. 775, 42 L.Ed.2d 801 (1975), the court found that allegations of two acts of interstate transportation of stolen property and one act of "causing a person to travel in interstate commerce in furtherance of a scheme to defraud," all occurring within five days of each other in furtherance of the same criminal episode, was sufficient to establish a "pattern of racketeering activity." *See also Bankers Trust Co. v. Rhoades,* 741 F.2d 511, 524 (2d Cir.1984), *vacated,* —— U.S. ——, 105 S.Ct. 3550, 87 L.Ed.2d 673 (1985) ("Two acts in the same criminal episode may establish a pattern of racketeering").

The viability of these holdings has been drawn into question, however, by dicta in the Supreme Court's recent decision in *Sedima,*[9] and more fundamentally by concerns

---

9. *See* 105 S.Ct. at 3285 n. 14:

As many commentators have pointed out, the definition of a "pattern of racketeering activity" differs from the other provisions in § 1961 in that it states that a pattern *"requires* at least two acts of racketeering activity," § 1961(5) (emphasis added), not that it "means" two such acts. The implication is that while two acts are necessary, they may not be sufficient. Indeed, in common parlance two of anything do not generally form a "pattern." The legislative history supports the view that two isolated acts of racketeering activity do not constitute a pattern. As the Senate Report explained: "The target of [RICO] is thus not sporadic activity. The infiltration of legitimate business normally requires more than one 'racketeering activity' and the threat of continued activity to be effective. It is this factor of *continuity plus relationship* which combines to produce a pattern." S.Rep. No. 91–617, p. 158 (1969) (emphasis added). Similarly, the sponsor of the Senate bill, after quoting this portion of the

Report, pointed out to his colleagues that "[t]he term 'pattern' itself requires the showing of a relationship.... So, therefore, proof of two acts of racketeering activity, without more, does not establish a pattern...." 116 Cong.Rec. 18940 (1970) (statement of Sen. McClellan). See also *id.,* at 35193 (statement of Rep. Poff) (RICO "not aimed at the isolated offender"); House Hearings, at 665. Significantly, in defining "pattern" in a later provision of the same bill, Congress was more enlightening: "criminal conduct forms a pattern if it embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." 18 U.S.C. § 3575(e). This language may be useful in interpreting other sections of the Act. Cf. *Iannelli v. United States,* 420 U.S. 770, [95 S.Ct. 1284, 43 L.Ed.2d 616] (1975).

The Supreme Court's observation that "two isolated acts of racketeering activity do not constitute a pattern" directly contradicts the impli-

expressed by the Second Circuit itself that RICO "is being far more frequently used for purposes totally unrelated to its expressed purpose." *Sedima, S.P.R.L. v. Imrex Co., Inc.,* 741 F.2d 482, 487 (2d Cir. 1984), *rev'd,* 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985). Thus, several recent lower court cases in this Circuit have indicated that multiple predicate acts alleged to have been committed in connection with a single business transaction or in furtherance of a single criminal episode are not sufficient to establish a "pattern of racketeering activity." *See Richter v. Sudman,* 634 F.Supp. 234, 239 (S.D.N.Y. 1986); *Soper v. Simmons International, Ltd.,* 632 F.Supp. 244 (S.D.N.Y.1986); *Anisfeld v. Cantor Fitzgerald & Co., Inc.,* 631 F.Supp. 1461, 1467 (S.D.N.Y.1986); *Frankart Distributors, Inc. v. RMR Advertising, Inc.,* 632 F.Supp. 1198 (S.D.N.Y. 1986); *Utz v. Correa,* 631 F.Supp. 592 (S.D. N.Y.1986); *Modern Settings, Inc. v. Prudential-Bache Securities, Inc.,* 629 F.Supp. 860 (S.D.N.Y.1986); *cf. Rush v. Oppenheimer & Co., Inc.,* 628 F.Supp. 1188, 1198–1200 (S.D.N.Y.1985) (questions whether "pattern" can be comprised of "predicate act segments of one criminal project"). Other courts, however, adhere to the view that separate predicate acts committed in furtherance of a single scheme to defraud constitute a "pattern." *See, e.g., First Federal Savings and Loan Assn. of Pittsburgh v. Oppenheim, Appel, Dixon & Co.,* 629 F.Supp. 427, 445 (S.D.N.Y.1986); *Conan Properties, Inc. v. Mattel, Inc.,* 619 F.Supp. 1167 (S.D.N.Y.1985).

This court believes that the more restrictive approach advocated in *Northern Trust Bank/O'Hare* closer approximates the intentions of the drafters of RICO. The Racketeer Influenced and Corrupt Organizations Act, enacted as Title IX of the Organized Crime Control Act of 1970, Pub.Law 91–452 (1970), was designed "to seek the eradication of organized crime in the United States ... by providing new remedies to deal with unlawful activities of those engaged in organized crime." 116 Cong.Rec. 35191 (1970). The statute was enacted to combat the pervasive influence of organized mobsters on American economic and social life, not to subject ordinary criminals to the heightened punishment provided by the Act, *United States v. Lemm,* 680 F.2d 1193, 1198 (8th Cir.1982), *cert. denied,* 459 U.S. 1110, 103 S.Ct. 739, 74 L.Ed.2d 960 (1983), nor to "federaliz(e) broad areas of state common law of frauds." *Sedima,* 105 S.Ct. at 3292 (Marshall, J., dissenting). In recent years, however, courts have expressed concern that an expansive reading of the civil provisions of RICO would displace the remedial schemes created by Congress for the federal crimes listed as predicate acts in § 1961(1), as well as "federalize" certain causes of action previously considered within the domain of state courts, particularly business fraud, bank fraud, and "garden variety" securities fraud. *Sedima,* 741 F.2d at 486–88, *rev'd,* 105 S.Ct. 3275 (1985).

The Supreme Court suggested in *Sedima* that "[t]he 'extraordinary' uses to which civil RICO has been put appear to be ... [in part] the result of ... the failure of Congress and the courts to develop a meaningful concept of 'pattern.'" 105 S.Ct. at 3287. Looking to the legislative history of RICO itself, the Court suggested in dicta that it is a showing of "'continuity plus relationship which combines to produce a pattern.'" *Id.* at 3285 n. 14 (emphasis in original), quoting S.Rep. No. 91–617, p. 158 (1969). In the present case there is no doubt that the predicate acts alleged by plaintiff are related to one another, since they arise out of the same business transaction. Plaintiff has failed, however, to allege facts demonstrating that any combination of the defendants had ever engaged in racketeering activity before or after the allegedly fraudulent business deal that is the subject of this suit, nor are any facts alleged supporting the conclusion that any

cations of *United States v. Weisman.* Further, a requirement of "continuity" would bring the

holding in *Parness* in doubt.

combination of the defendants were engaged in criminal activities elsewhere. Thus, plaintiff has failed to allege facts evidencing the " 'continuity' sufficient to form a 'pattern of racketeering activity.' " *Superior Oil Co. v. Fulmer*, 785 F.2d 252, 257 (8th Cir.1986).

A series of predicate acts arising out of a single business transaction are not sufficient to constitute a "pattern of racketeering activity" within the meaning of the Act.[10] Consequently, plaintiff's claims based upon the conduct of an enterprise through a "pattern of racketeering activity" must be dismissed.

### III. PLAINTIFF'S ALLEGATIONS OF "COLLECTION OF UNLAWFUL DEBT"

RICO prohibits any person from conducting or participating in the conduct of an enterprise through the "collection of unlawful debt." 18 U.S.C. § 1962(c) (1982). "Unlawful debts" under the statute include debts "incurred in connection with ... the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6) (1982). Under New York law a bank or trust company may not "take, receive, reserve or charge on any

loan or discount made, or upon any note, bill of exchange or other evidence of debt ... interest ... at a rate greater than the rate prescribed by the banking board pursuant to (N.Y.Banking Law § 14-a (McKinney 1971 & Supp.1986))." N.Y.Banking Law § 108 (McKinney 1971 & Supp.1986). On April 19, 1983 the maximum rate established by the banking board was 16%. *N.Y.Admin.Code* tit. 3, § 4.1 (1984).

Plaintiff alleges that the promissory note dated April 19, 1983 running from plaintiff to the defendant Bank in the amount of $88,328.76 is usurious. Plaintiff claims that although the note on its face purports to charge interest of only 12%, this is but a subterfuge designed to conceal an actual rate exceeding 40%, more than twice the enforceable rate under New York's usury laws. Apparently, $35,000 of the $88,328.76 total covered by the note was for money paid by the Bank to Gleason & Salluzzo and Robert Salluzzo as finder's fees, some or all of which plaintiff contends was "kicked back" to Vincent Salluzzo and Bank Vice-President Charles Moyses. (Amended Complaint ¶ 31(e)). Plaintiff argues that this $35,000 should not be considered part of the principal but instead as interest, and therefore the note is usurious.

In determining the amount of the principal of a loan, courts must look to the

---

**10.** The Second Circuit's recent pronouncement in *United States v. Teitler*, 802 F.2d 606 (2d Cir.1986), that a conspiracy to commit two predicate acts can constitute a conspiracy to conduct the affairs of an enterprise through a "pattern of racketeering activity" in violation of 18 U.S.C. § 1962(d) (1982) is not inconsistent with the holding in this case. In *Teitler*, one of the defendants in a criminal RICO prosecution under 18 U.S.C. § 1963 (1982), an attorney, was charged with two counts of mail fraud arising out of two false housekeeping and medical claims made on behalf of two separate clients in an effort to defraud insurance companies. The Court of Appeals stressed that "the number of [predicate] acts is not crucial" in determining whether a "pattern of racketeering activity" has been established; "[i]nstead, the key question is whether the factor of ' "continuity plus relationship" ' shows that the subject acts were not ' "sporadic activity," ' but part of a pattern." *Teitler*, 802 F.2d 611 (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 105 S.Ct. 3275, 3285 n. 14, 87 L.Ed.2d 346 (1985).

Nothing in this opinion is meant to contradict the principle stated by the Second Circuit in *Teitler*. By its terms, the Racketeer Influenced and Corrupt Organizations Act recognizes that two acts of "racketeering activity" can establish a "pattern." 18 U.S.C. § 1961(5) (1982), *see* note 5, *supra*. The facts of *Teitler* are distinguishable from those of the present case, however. In *Teitler*, though the predicate acts with which the defendant was charged were similar in purpose (the defrauding of insurance companies), had similar participants (clients claiming personal injuries from automobile accidents) and similar victims (insurance companies), and employed similar methods, the two alleged predicate acts were nonetheless connected to two separate and distinct criminal episodes. In the present case, the acts alleged are tied to a single criminal episode to defraud plaintiff. In contrast to *Teitler*, the allegations in this case are insufficient to establish the "continuity" necessary to find that a "pattern of racketeering activity" exists.

actual consideration given by the lender. Any "bonus" retained by the lender and not made available to the borrower cannot be considered part of the principal of the loan for purposes of determining whether a loan is usurious. *See, e.g., Schwartz v. Sweitzer,* 202 N.Y. 8, 94 N.E. 1090 (1911); cf. *Valley National Bank of Long Island v. Levy,* 45 A.D.2d 771, 356 N.Y.S.2d 1003 (2d Dept.1974) ("A mortgage may only be enforced to the extent of the actual consideration"). It is well established, however, that "[a] lender cannot be charged with usury on account of any commission or bonus paid by the borrower to his own agent, or to an independent broker, for services in negotiating or procuring the loan, if the lender had ... no interest in ... such payment." 32 N.Y.Jur. *Interest and Usury* § 68 (1963); *Kaufman v. Schwartz,* 183 A.D. 510, 170 N.Y.S. 318 (1st Dept. 1918). Therefore, plaintiff cannot rely on the payments made by the Bank to plaintiff's accountants, Gleason & Salluzzo and Robert Salluzzo, as a basis for his claim that the April 19 note was usurious. Support for plaintiff's allegation of usury must be found, if at all, in his assertion that Vice-President Moyses received "kickbacks" from the money paid by the Bank to the accountants.

As a general rule, a loan is not rendered usurious when the lender's agent, without the knowledge, consent, or authorization of the lender, collects a commission or fee for his own benefit. Annot., 52 A.L.R.2d 703, 737 (1957); 3 N.Y.Jur.2d *Agency* § 252 (1980); *Robertson v. Merwin,* 154 A.D. 723, 139 N.Y.S. 726 (2d Dept. 1913). Even if plaintiff's allegation of kickback payments was true, plaintiff has failed to plead facts indicating that Moyses acted with the Bank's authorization, actual or apparent, or that the Bank benefitted from monies received by Moyses, if any. Therefore, plaintiff's claims based upon the "collection of unlawful debt" must be dismissed.

## IV.  CONSPIRACY

Plaintiff also makes five separate claims predicated on § 1962(d), which pro-

vides that "[i]t shall be unlawful for any person to conspire to violate any of the provisions" of § 1962(a), (b), or (c). This court's conclusion that plaintiff has failed to plead facts sufficient to support a finding of a "pattern of racketeering activity" or "collection of unlawful debt" also precludes a finding of conspiracy to violate § 1962(c). *See Rush v. Oppenheimer & Co., Inc.,* 628 F.Supp. 1188, 1198 n. 5 (S.D. N.Y.1985). Therefore, plaintiff's conspiracy claims must also be dismissed.

## V.  CONCLUSION

Plaintiff's amended complaint is dismissed with leave to file a second amended complaint within 30 days. Plaintiff is admonished to carefully draft his complaint in accordance with this opinion, eliminating the repititious or irrelevant matter that pervades the original and amended complaints filed in this action.

IT IS SO ORDERED.